CHARLES DENECKE, Appellee, v. N. P. WEST et al.,
Appellants.

**PRINCIPAL AND SURETY:** Ultra Vires in Re Surety Bond. Stat-
1   utory authority to guarantee the fidelity of persons "in positions
of trust, private or public," authorizes the issuance of a bond
which guarantees the performance of a purely private contract
undertaking.

**PRINCIPAL AND AGENT:** Secret Limitations on Power of Attor-
2   ney. A recorded power of attorney to execute surety bonds may
not be limited by unrecorded limitations thereon, not brought
to the knowledge of third parties.

**PRINCIPAL AND AGENT:** Failure of Agent to Account. A bond
3   is in no wise affected by the fact that the agent did not account
to his principal for the premium collected.

**CORPORATIONS:** Estoppel to Deny Corporate Power. A corpora-
4   tion which has full knowledge that its agent has exceeded his
powers, and takes no steps to prevent an innocent third person
from relying on the acts of such agent, may not plead *ultra
vires.*

**PRINCIPAL AND SURETY:** Surety Contract Violative of Public
5   Policy. A surety bond guaranteeing the performance of a pure-
ly private contract obligation, is not violative of public policy.

**PRINCIPAL AND SURETY:** Presumption as to Corporate Act. A
6   surety bond will be presumed to be within the corporate powers
of the company issuing it.

**INSURANCE:** Statutory Authority for Surety Bond. Surety bonds
7   guaranteeing the performance of purely private contract obliga-
tions are not prohibited by our statute law. (Sec. 1709, Code
Supp., 1913.)

*Appeal from Linn District Court.*—JOHN T. MOFFIT, Judge.

OCTOBER 18, 1918.

ACTION at law to recover upon a surety bond. There
was a directed verdict for the plaintiff, and from the judg-
ment rendered thereon, the defendant appeals.—*Affirmed.*

*Coffin & Rippey* and *Redmond & Stewart,* for appellants.

*Barnes, Chamberlain & Hanzlik,* for appellee.

WEAVER, J.—On February 17, 1914, the defendant West sold and conveyed to the plaintiff a described half section of land in the state of Colorado. At the time of said sale and conveyance, and as a part of the same transaction, the grantor and grantee entered into a written contract, which, in view of the somewhat peculiar nature of the controversy, we here set out in full.

1. PRINCIPAL AND SURETY: *ultra vires in re* surety bond.

## "CONTRACT.

"This contract, made in duplicate and entered into this 17th day of February, 1914, by and between N. P. West of Linn County, Iowa, party of the first part, and C. Denecke, party of the second part, witnesseth:

"Party of the first part has this day sold to party of the second part a certain half section of land legally described as follows: The north half Section 7, Township 2 South, Range 64 West of the 6th P. M., Adams County, Colorado, containing 320 acres, more or less, according to government survey.

"Party of the second part has purchased above-described land, and for the same has paid the sum of $2,800 in cash, the said land being transferred subject to the encumbrance now against it, amounting to $2,000. Deed to the above-described land has this day passed to the party of the second part, and party of the first part hereby agrees to furnish second party an abstract, showing good and merchantable title to said land, free and clear from all encumbrances excepting the above-mentioned $2,000, as soon as said abstract can be prepared by the abstract company.

"Inasmuch as second party has purchased the above-described land without the usual inspection and investiga-

tion, and inasmuch as first party has sold the same at a price lower than any of this near-by land has been sold, it is agreed between first and second party hereto as follows:

"Party of the second part shall hold title to said land for one year, or until such earlier date as said land may be resold at a profit satisfactory to both parties hereto. Party of the second part agrees to allow the first party to have the exclusive reselling of said land for one year, and party of the second part shall transfer title of said land to the new purchaser when the first party furnishes such a purchaser who shall pay enough cash that second party shall receive at least $3,300 from said sale.

"Party of the first part agrees to use his best efforts in the selling of the above-described land, and expects to be able to resell same within one year at $25 per acre or more. Whatever amount may be agreed upon, however, in the reselling of this land, the amount received above $15 per acre shall be divided equally between the first party and the second party hereto.

"To make more certain the reselling of said half section, the first party does hereby agree to put 100 acres of same into crop during the spring of 1914. The seed shall be furnished and the work shall be done at the expense of first party, but one half the expense of harvesting, threshing, and marketing said grain shall be paid by the second party, and second party shall receive one half the crop raised on said 100 acres.

"If, for any cause, party of the first part is unable to accomplish the reselling of this land within one year from date hereof, then the party of the first part reserves the right to purchase back from second party the above-described land. And first party does hereby bind himself to purchase back said land from party of the second part, paying party of the second part the sum of $3,300 in cash, within one year, for said land, and taking the same *subject*

to the $2,000 encumbrance. Said $3,300 is to be paid to party of the second part in cash, in excess of whatever amount is paid to second party from the proceeds of his *one-half share of crop.*

"The agreements and obligations herein made by the party of the first part are guaranteed to party of the second part by the surety bond of even date hereof, signed by party of the first part and the New England Casualty Company of Boston as surety, a copy of which bond is attached hereto and made a part of this contract.

"Witness our hands and seals this day and year first above written.

"First Party, N. P. West,
"Second Party, C. Denecke."

The bond made and delivered in pursuance of said contract is as follows:

"Surety Bond.

"Know All Men By These Presents: That we, N. P. West, of Linn County, Iowa, and the New England Casualty Company, of Boston, are jointly and severally bound and firmly held unto C. Denecke, of Linn County, Iowa, in the sum of $3,300, the payment of which, well and truly to be made, we hereby bind ourselves and assigns and legal representatives. The conditions of the above obligation is as follows, to wit:

"Whereas, said N. P. West has sold unto C. Denecke the north half Section 7, Township 2 South, Range 64 West of the 6th P. M., Adams County, Colorado, containing 320 acres, more or less, and has contracted to place in crop 100 acres of same for one half the crop raised thereon; also to repurchase said half section at the end of one year from date for $3,300 (subject to its encumbrance of $2,000) providing said land has not been resold by N. P. West prior to that time, and satisfactory settlement made with C. Denecke:

"Now, Therefore, if said N. P. West shall resell above-described land or repurchase said land within one year from date hereof, and pay to said C. Denecke the sum of $3,300 or more for same, in addition to *assuming* the $2,000 encumbrance thereon, then this obligation shall be void. Otherwise, it shall be in full force and virtue; and we do hereby bind ourselves, our assigns, and our representatives to faithfully fulfill said agreement made by N. P. West, and contained in the contract attached hereto and made a part hereof.

"Witness our hands and seals this 17th day of February, in the year of our Lord, 1914.

"Seal impressed:

"New England Casualty . Company, Boston, Mass.
"Incorporated, 1901.

"N. P. West.
"New England Casualty Company of Boston,
                    "By Thos. B. Powell, Attorney in Fact.
                    "By Fred W. Higley, Attorney in Fact."

On March 22, 1915, the plaintiff brought this action, alleging breach of the contract and bond on the part of West, and asking for recovery of his damages against both West and the Casualty Company. To this action the Casualty Company appeared, and answered, in substance, that, under its articles of incorporation, and under the laws of Massachusetts, where it was organized, and the laws of Iowa, where the bond in suit was executed, it had and has no power or authority to issue or enter into bonds or contracts of the character of the one in suit, and that the instrument sued upon is, therefore, void. It is further pleaded that the agents or attorneys who appear to have executed the bond in the company's name acted without its authority and without its knowledge or consent, and that the company never received any compensation for becoming the surety of West, and that the bond was and is without

any consideration or compensation for the risk so purported to have been assumed. It is also alleged that, while Higley, who executed the bond in the company's name, was its agent, his agency was of a strictly limited kind, and he was authorized to issue surety bonds only after reporting applications therefor to the company and receiving its approval; that no application for this alleged bond was ever reported by him, nor did he ever report or remit to the company any collection of the premium thereon.

In reply, plaintiff alleges that, on and prior to March 14, 1914, the defendant had full knowledge and notice of the execution of said bond in its name by its agents, but took no steps to cancel or repudiate such bond, or to notify plaintiff that the bond was claimed to be *ultra vires;* but, on the contrary, knowing that it had been executed, and that plaintiff was relying thereon, the company permitted it to stand without objection or denial to the plaintiff for a full year, and until the expiration of the full term which said bond was intended to cover. Plaintiff avers that he did, in fact, rely upon the validity and binding force of said bond, and took no steps to protect himself against loss, as he would have done had he known that the company would deny its liability on the written obligation made and executed by its agent; and that because thereof, the defendant is now estopped to plead or deny the right of the plaintiff to have the same enforced by proper action in court.

The issues having been brought to trial to a jury, the plaintiff put in evidence the deed, contract, and bond already mentioned, and testified that West failed to accomplish any sale of the land within the agreed period of one year, and has ever since failed to repurchase the land or pay the agreed price therefor, and that said West is now insolvent. He also introduced the power of attorney given by the bond company to Fred M. Higley and Thomas B. Powell, authorizing them to execute surety bonds in the

name of the company, which written power was accompanied by a resolution of the company's board of directors, authorizing their president and secretary to execute it. The instrument is in the following form:

"POWER OF ATTORNEY

"NEW ENGLAND CASUALTY COMPANY

"Home Office, Boston, Massachusetts.

"Know All Men by These Presents: That the New England Casualty Company, by Edwin Gott, its vice-president, and William J. Lewis, its assistant secretary, in pursuance of a certain resolution duly passed by the board of directors of said company at a regular meeting of that body held on the 21st day of December, 1911, a copy of which is hereto attached, does hereby nominate, constitute and appoint Fred M. Higley and Thomas B. Powell or Fred M. Higley and Frank H. Randall, of Cedar Rapids, Iowa, its true and lawful agents and attorneys in fact, to make, execute, seal and deliver for and on its behalf as surety, and as its act and deed, any and all bonds, recognizances, or undertakings, in the state of Iowa, for or on behalf of the company.

"And the execution of such bonds or undertakings in pursuance of these presents shall be as binding upon said company, as fully and amply, to all intents and purposes, as if they had been duly executed and acknowledged by the regularly elected officers of the company, at its office in Boston, Mass., in their own proper persons.

"In Witness Whereof, the said Edwin Gott, vice-president, and William J. Lewis, assistant secretary, have hereunto subscribed their names and affixed the corporate seal of the said New England Casualty Company, this twenty-fifth day of June, A. D. 1913.

"Attest:                    William J. Lewis, Assistant Secretary.

"Edwin Gott, Vice President."

"At a regular meeting of the board of directors of the New England Casualty Company, held in its office in the city of Boston, commonwealth of Massachusetts, on the 21st day of December, 1911, the following resolution was unanimously adopted, to wit:

"Whereas, it frequently becomes necessary for a representative of the company to execute a bond on behalf of the company, which, for lack of time or some other cause, it is impossible to have executed by the regularly elected officers of the company.

"Therefore, Be It Resolved that the president, or either of the vice-presidents, by and with the concurrence of the secretary or assistant secretary, is hereby authorized to empower any representative of the company to execute, on behalf of the company, any bond which the company might execute through its duly elected officers.

"I, William J. Lewis, Assistant Secretary of the New England Casualty Company, hereby certify that the aforegoing is a true copy taken from the records of proceedings of the board of directors of the New England Casualty Company, and is still in force.

"In Testimony Whereof, I have hereunto subscribed my name as assistant secretary, and affixed the corporate seal of the New England Casualty Company, this 25th day of June, A. D. 1913.

"Wm. J. Lewis,

"Assistant Secretary."

In defense, the company exhibited its articles of incorporation, and examined its officers and directors severally concerning the nature of its business and the extent of the authority which it delegated to local agents. Most of them denied having any knowledge of the giving of the bond in suit, and denied that it was within the scope of their corporate power or authority, or of the power or authority

conferred upon the company's agents. They also denied having any report or notice that the agents had, in fact, assumed the authority to execute the bond, or had reported its execution, or paid over any premium collected thereon; and alleged that the company promptly repudiated the transaction as soon as it came to its knowledge, about the time this suit was begun. Other testimony for the defense and for the plaintiff in rebuttal, so far as the same is material, will be mentioned in the further progress of this opinion.

At the close of the evidence, plaintiff moved for a directed verdict in his favor against both defendants, on the ground that the undisputed testimony established his right to recover, as a matter of law. The defendant company also moved for a directed verdict because it appears from the evidence, without dispute, that the execution of the bond was in excess of the authority of the corporation under the law of the jurisdiction where it was organized, as well as under the laws of Iowa, and it is, therefore, void and of no effect. As further grounds assigned for such motion, the company states that the acts of the agent Higley were not within the scope of the authority conferred upon him, and were against public policy; and that the plaintiff's plea of estoppel cannot be sustained, because the bond executed by Higley was not simply voidable, but absolutely void.

The trial court denied the motion made in behalf of the company, and sustained plaintiff's motion. A directed verdict for plaintiff was then returned; and from the judgment thereon, the company appeals.

From the foregoing statement, it will be seen that the primary inquiry upon this appeal involves an examination into the power and authority of the appellant company to become surety upon the bond in suit, and the real or apparent power conferred upon the appellant's agents, Higley and Powell, to bind the appellant by the execution of such bond in its name.

Turning first to the plea of *ultra vires,* the burden of establishing which was upon the appellant, we are very clear that, as a matter of law, it is not sustained by the evidence. Appellant's showing in this respect is that, as originally organized in Massachusetts, its business was limited to a species of accident insurance; but that thereafter, and before the issuance of the bond in suit, its charter and articles of incorporation were so amended and so broadened in scope as to authorize the company (quoting from the amended article) to "engage in all classes of business specified in the third and eleventh clauses of Section 32 of Chapter 576 of the Acts of 1907, to wit: to guarantee the fidelity of persons in positions of trust, private or public, and to act as surety on official bonds and for the performance of their obligations; and to insure against loss or damage by burglary, theft or housebreaking; and to engage in all other classes of business now or hereafter permitted to domestic corporations authorized by law to do business under the said third and eleventh clauses; and to engage in any other classes of business now or hereafter permitted under the laws of Massachusetts to domestic insurance companies having a capital stock of $600,000."

The section of the statute referred to in the foregoing quotation as the measure of the appellant's authority to do a surety business, provides for the organization of corporations to do insurance business; and in the specification of powers conferred upon such corporations is the following:

"Third. To guarantee the fidelity of persons in positions of trust, private or public, *and to act as surety on official bonds* and *for the performance of other obligations.*"

At the stockholders' meeting which approved the change in the appellant's articles of incorporation, it was voted to engage in all classes of business authorized by the section of the statute already referred to, specifying suretyship on

official bonds, indemnifying bonds, and guaranty of the fidelity of persons in positions of trust, and (among other things), "to engage in all other classes of business now or hereafter permitted to corporations organized to do business under said fifth clause."

That the powers thus given to appellant are broad enough to include the giving of bonds such as the one here being considered, we think there is no room to doubt. Indeed, the appellant's witnesses, its officers and directors, in effect admit that, according to their own interpretation, it was a line of business in which they could properly engage and would engage, if it was tendered under conditions which made it reasonably safe. For example, the witness Briggs, vice-president of the company, and the officer to whom, as we shall see, the proposal of Higley to issue this very bond was referred before the date of its execution, being examined for the defense, testified as follows:

"Int. 15. You may state, if you know, whether or not you, yourself, or anyone working under or for you, or The New England Casualty Company, or your department, had ever been given authority, right or power, either express or implied, to sign the said alleged bond marked Exhibit B.

"Answer. Certain officers in the home office had authority to execute such instruments, but no authority had been delegated to any person to execute this instrument."

It was further shown, in the testimony, without dispute, that, before the bond was made, Higley reported the proposed transaction, with copy of the proposed bond, to the appellant's general agents at Des Moines, who directed Higley to hold the matter in abeyance until they could communicate with the home office; and, this being done, the appellant, by Briggs, its vice-president, wrote the general agents, saying:

"This is a class of business which we would not con-

sider under any circumstances, *without negotiable collateral
to the full amount of our bond.*"

Thereupon, the general agents, thus instructed, wrote
Higley that the "company looks upon this class of business
as undesirable, and would not consider it under any circum-
stances without first securing negotiable collateral to the
full amount of the bond." Others of the appellant's officers
and directors, being asked, on cross-examination, whether
the corporation did not execute bonds to secure the perform-
ance of contracts and bonds of indemnity and other mis-
cellaneous surety bonds, answered: "Only with satisfactory
financial security in the way of cash or negotiable collat-
eral." In the correspondence which took place between
Higley and other representatives of the company before the
bond was issued, there was, as we have seen, no objection
raised by the latter because of any want of power or author-
ity to accept such business, but rather, that it was of an
undesirable class of risks, which the company would refuse
if not accompanied with counter security in negotiable pa-
per to the full amount of the bond. Under no accepted rule
of interpretation or construction can the appellant's articles
of incorporation or the statutes authorizing the same fairly
be held to forbid the giving of the bond. Though somewhat
novel in some of its features, the contract between plaintiff
and West was one by which, upon a certain contingency,
West was to become bound to purchase the described land
at a stated price, upon a date certain; and the effect of the
bond was to make appellant the surety for West for the
performance of his said contract obligation. It may be
that a careful and conservative company ought to refuse
any hazard with respect to such an agreement; but that ob-
jection goes only to the wisdom of such a transaction, and
not to the power of the company.

The appellant's further proposition, that the execution
of such bond was not within the real or apparent scope of

the authority conferred upon Higley, or Higley and Powell, is not borne out by the record. On the con-

2. Principal and Agent: secret limitations on power of attorney.

trary, the power and authority of the company to enter into obligations of that nature being established, it is shown beyond doubt that such authority was delegated to their attorneys in fact. Naturally and properly, upon this question, we turn first to the written power itself; and that, in express terms, names both Higley and Powell as its lawful attorneys and agents, with power "to make, execute, seal and deliver, for and on its behalf as surety, and as its act and deed, any and all bonds, recognizances, or undertakings, in the state of Iowa, for and on behalf of the company. And the execution of such bonds or undertakings in pursuance of these presents shall be as binding upon such company, as fully and amply, to all intents and purposes, as if they had been duly executed and acknowledged by the regularly elected officers of the company, at its office in Boston, Mass., in their own proper persons."

The resolution of the board of directors provided for the granting of such powers of attorney, and declared that the bonds executed by such attorneys or agents "shall be as binding upon such company as fully and amply to all intents and purposes as if they had been duly executed and acknowledged by the regularly elected officers of the company at its office in Boston, Massachusetts, in their own proper person." This power of attorney and its authorization, the appellant admits, were duly recorded in Iowa. In their letter transmitting this power of attorney to Higley, the state agents described it as giving powers which "are practically unlimited," but said to him that he would have to be guided by the limitations set out in a certain letter from the company, which was furnished him with that instrument. This letter, with its limitation upon the power of the attorney, was not recorded, nor is there any showing

that it ever came to the notice or knowledge of the plaintiff, until developed in this litigation. This letter of instructions tells the agent that he must read it into his power of attorney; informs him that he is authorized to issue certain bonds without submission to the home office; and among the bonds so enumerated is the following:

"On contract bonds you are permitted to accept risks and execute bonds without reference, provided the bond does not exceed $5,000, and the contract does not exceed $10,000."

Another clause directs the agent to submit to the consideration of the home office all applications for bonds other than such as were authorized in the instructions.

So far as the letter of instruction is concerned, it may serve to measure the obligation of the agent to his principal, and be a matter of material consideration in questions or controversies arising between them; but it is hardly necessary to cite authorities in support of the proposition that, unless such instruction or limitation upon the power of the agent holding a power of attorney is brought home to the notice or knowledge of a third person who deals with the agent as such, it is wholly immaterial, and will not serve to relieve the principal from any obligation which, except for such instruction, would be binding upon him. *City of Davenport v. Peoria M. & F. Ins. Co.*, 17 Iowa 276; *Viele v. Germania Ins. Co.*, 26 Iowa 1, 58; *Spence v. Chicago, R. I. & P. R. Co.*, 117 Iowa 1, 5; *Fishbaugh v. Spunaugle*, 118 Iowa 337, 341. There is, as we have already noted, an utter absence of evidence that the limitation so placed upon the authority of Higley was brought to the notice of plaintiff; and we can conceive no sound reason for permitting the secret instructions by appellant to its agents to deprive plaintiff of his right to a recovery upon the bond.

Counsel have given considerable attention to the claim that Higley never paid over or accounted for the premium

on the bond.  It appears, without dispute, that Higley re-
ceived the premium; and, so far as plain-

**3. PRINCIPAL AND AGENT: failure of agent to account.**  tiff is concerned, this is a payment to the company.  Higley swears, also, that he re-
mitted it to the general agents, but this is
denied by the appellant; and it may be conceded that, if
the fact in this respect were material to a proper finding
upon the issues in this case, the question should·have been
submitted to the jury.  But the matter of an accounting
between appellant and Higley is one in which the plaintiff
has no interest; and whether the premium was or was not
paid over by the agent, we need not attempt to determine.

Were the right of the plaintiff otherwise in doubt, we
are of the opinion that the appellant is estopped, as a matter
of law, to set up the plea of *ultra vires*.  Corporations, no
less than natural persons, are held to the

**4. CORPORATIONS: estoppel to deny corporate power.**  obligations of good faith and fair·dealing.  Within a very few days after the bond was
made to the plaintiff, the fact became known
to the company,—at least, to its general state agents,—and
(apparently) to one or more of its principal officers at the
home office.  If it desired to repudiate the transaction, and
deny the binding effect of the bond, every principle of good
faith required it to notify the plaintiff promptly, and thus
give him opportunity to protect his interests.  That the
company and its officers knew and appreciated its duty in
this respect, is clearly shown.  Two days after the date of
the bond, the general agents wrote Higley, saying:

"Re: N. P. West, Cedar Rapids, Ia.

"The enclosed financial statement and copy of contract
and copy of bond was enclosed in your letter to us this
morning, without any comment.  We do not know whether
or not you have executed any bond· of this character, but
if you have, you have exceeded your authority, and have done
so contrary to the instructions recently written you.  We

should like to hear from you as to this, and greatly oblige."

The correspondence thus indicated seems to have been carried on between the company's agents and lawyers on the one hand, and Higley and Powell on the other, during a period of several weeks. The company's lawyers informed Higley and Powell of their purpose to notify plaintiff of the situation and cancel the bond; but, on request from Powell, refrained from so doing. On March 16, 1914, they again wrote Powell (who seems alone to have been representing West), saying:

"The New England Casualty Co. does not feel that there is any liability on their part under this bond, and, if the occasion demands, they will take the steps necessary to indicate the same to the obligee. At your request, we refrained from serving the said notice solely in order to save the N. P. West Co. any embarrassment which might result from the cancellation of the bond in question. We feel that we have given the N. P. West Co. all of the consideration to which they are entitled in this matter, and at the same time, we herewith express our appreciation of your efforts in the same. You can readily understand, however, that we cannot allow this matter to lapse any longer and if the same is not taken care of by Friday, we will be required to serve the notice above referred to. Due to the circumstances surrounding this matter, we feel that, in the event of the N. P. West Land Co. or N. P. West suffering any damages because of the cancellation of the said bond, the N. P. West Co. will be required to look to Fred M. Higley and others, and not to the New England Casualty Co."

The abstracts do not clearly reveal how the correspondence ended, or whether it was dropped, as being productive of no satisfactory result. There is, however, no pretense that the company's declared purpose to lay the matter before the obligee in the bond, or to give him notice of any purpose on its part to deny its obligation, was ever carried

out. Plaintiff was thus left in ignorance of the company's attitude, relying upon the security afforded by the bond until the time provided for therein had expired; and at that date, West, who was apparently solvent when the bond was given, had become insolvent. That a corporation may estop itself from claiming the benefit of the plea of *ultra vires,* as against its clearly proved promise or contract, is well established; and this is especially true in the absence of any express statutory prohibition of the act alleged to be *ultra vires. Watts v. Equitable Mut. Life Assn.,* 111 Iowa 90; *Iowa Drug Co. v. Souers,* 139 Iowa 72, 79; *Moore v. First Ruthven, etc., Church,* 117 Iowa 33; *Field v. Eastern B. & L. Assn.,* 117 Iowa 185; *Tierney v. Butler,* 144 Iowa 553, 557. See, also, *Fidelity Ins. Co. v. German Sav. Bank,* 127 Iowa 591, and the numerous precedents cited on page 596 of that opinion.

As we have already seen, there appears to be nothing in the statute or in appellant's articles of incorporation forbidding the transaction in question; but, on the contrary,

5. PRINCIPAL AND
SURETY: surety
contract viola-
tive of public
policy.

it seems to be fairly within the scope of its corporate powers. Nor can we find any reason for holding the act to be contrary to public policy, unless we go to the extreme of saying that the whole business of entering into surety contracts is opposed to public policy; and this, no one will be bold enough to assert.

In avoidance of the effect of the Massachusetts statute put in evidence by the plaintiff, appellant argues that the act was not properly proved or identified, and therefore

6. PRINCIPAL AND
SURETY: pre-
sumption as to
corporate act.

should not be considered. Should this objection be sustained, it would in no degree strengthen the position of the defense. The burden was upon the appellant to establish its assertion of *ultra vires.* In the absence of proof of the alleged limitation upon the company's corporate

power, there is no presumption that such power was exceeded, in entering into the bond. On the contrary, the presumption in such case is that its corporate acts are within the scope of the power granted it. Now, the proof offered by the company disclosed that it was organized for the expressed purpose of engaging in all classes of business specified in the third and eleventh clauses of "Section 32 of Chapter 576 of the (Massachusetts) Acts of 1907;" and in the same connection, after specifying the business of becoming surety on official bonds and for persons in positions of public and private trust, it again provides for power to engage "in all other classes of business now or hereafter permitted to domestic corporations authorized by law to do business under the said third and eleventh clauses, and to engage in any other class of business now or hereafter permitted," etc. The appellant having rested its defense upon this showing, without offering any proof of the provisions of the Massachusetts Act referred to, the plaintiff could safely have omitted the production and proof of the statute referred to; because in its absence, if the particular enterprises specified in the articles of incorporation should be thought not to include the giving of a bond like the one in suit, the court would still presume that it did come within the scope of the more general statutory powers which the corporation designated as the measure of its authority. The ruling of the trial court in admitting the proof of the statute even if erroneous (which we do not hold), was without prejudice to the appellant.

Nor do we find any merit in the objection that the giving of a bond like that in suit is unauthorized or forbidden under the laws of Iowa. An examination of the statute reveals no express or necessarily implied inhibition of such business. On the contrary, it is provided by our statute that corporations organized for that purpose may:

7. Insurance: statutory authority for surety bond.

"Insure the fidelity of persons holding places of private or public trust, or execute as surety any bond or other obligation required or permitted by law to be made, given or filed, except bonds required in criminal causes." Code Section 1709.

The contract between plaintiff and West was neither illegal nor immoral; and an individual becoming surety for its performance by West could not escape liability because of anything in its apparent character. In other words, West's agreement was one "permitted by law," and the obligation assumed by his surety was, with equal certainty, one "permitted by law," and the bond so given was quite clearly within the contemplation of the statute.

In conclusion, we may say that the cases *In re Mut. G. F. Ins. Co.*, 107 Iowa 143, *American Fid. Co. v. Bleakley*, 157 Iowa 442, and others cited and relied upon by the appellant, are not at all inconsistent with the views we have here expressed. The first of the cited cases does no more than approve the general rule which we have already noted, that a corporation is not estopped to plead *ultra vires* to an action on a contract which it is by statute expressly forbidden to make; while the other precedent sustains the action of the Iowa auditor of state in holding that a corporation organized to insure persons against accidents resulting in personal injury to the insured has no power or authority to insure them against liability which may be imposed upon them by law for any negligent or wrongful act of their own by which another is injured. The discussion to be found in those opinions is to be construed in the light of the issues there being considered; and when so read, it will readily be seen that they do not control the question now before us. For illustration of the attitude of the courts with reference to the plea of *ultra vires* where there is no distinct statutory prohibition of the contract sued upon, see *Kennedy v. California Sav. Bank*, 101 Cal. 495 (35 Pac. 1039);

*Wright v. Hughes,* 119 Ind. 324 (21 N. E. 907) ; *Whitney Arms Co. v. Barlow,* 63 N. Y. 62; also the expression of this court in *Watts v. Association,* supra.

Taking the whole record made on the trial below, there is no sound theory upon which a verdict for the defendant could have been sustained by the court, and the peremptory direction in plaintiff's favor was right. The judgment appealed from is—*Affirmed.*

PRESTON, C. J., GAYNOR and STEVENS, JJ., concur.